kaw

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNIVERSAL ENGRAVING, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **Case No. 07-2427-JAR** |
| | ) | |
| **FREDERICK DUARTE, PH.D.** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER GRANTING PLAINTIFF'S MOTION
## FOR PRELIMINARY INJUNCTION

The Court now considers Universal Engraving, Inc.'s Motion for Preliminary Injunction (Doc. 11).  An evidentiary hearing was held on September 21 and 26, 2007, after which the Court took the matter under advisement.  For the reasons set forth below, plaintiff's motion is granted.

## I.      BACKGROUND

*Universal Engraving, Inc. ("UEI")*

UEI is an employee stock ownership plan ("ESOP") company in the business of engraving and embossing.  The company was founded in 1971 and has grown extensively since servicing the European community and the Americas.  Engraving is quite the complicated feat. The engraving business evolves around using chemicals, machines, and computer technology to create images on copper or brass according to customer needs.  UEI, over the years, has invested in carving images onto copper or brass metal through techniques developed within and outside of

its walls.  Typically, the engraving is accomplished by hand engraving, photoetching done by using chemicals to erode certain portions of the metal, mechanical engraving done using manually operated milling machines, or through computer numerical control ("CNC") milling equipment.  Most CNC milling equipment functions with software programs designed by various vendors.  In UEI's case, it purchases software, then transforms it into applicable programs designed only for UEI's purposes and goals.

Over the years, UEI has developed not only software, but has redesigned most of its CNC milling machines to its specific needs.  UEI generally purchases CNC milling machines from suppliers and revamps those machines with parts bought from various suppliers.  After placing the parts together with the adaptive software that UEI either improves or edits, the new machines are then programmed to complete certain tasks as required by UEI.  UEI considers its processes and programs so secretive that it rids most equipment coming in its doors of any brand markings. Thus, employees are not aware of what brand of equipment is being used.  Furthermore, UEI requires confidentiality agreements with all its employees, requires passwords to access its computers, mandates signed confidentiality agreements for every meeting with employees, and restricts employees to certain facilities.  One such facility is the research and development building, which is locked twenty-four hours per day and restricted to employees with authorized access cards.

### *Dr. Frederick Duarte*

Dr. Frederick Duarte began his career with UEI as a research chemist in 1992.  Before starting work, Dr. Duarte signed a Confidentiality and Proprietary Rights Agreement wherein Dr. Duarte promised to keep confidential all of UEI's proprietary information, including

2

formulae, software, documentation, data, programs, trade secrets, and discoveries.  The agreement provided that:

> The parties acknowledge that UEI has been and will be engaged in a continuous program of acquisition, research, development and production respecting its business, present and future, and that, in connection with Employee's employment by UEI, Employee is and will be expected to make or have access to new contributions and inventions of value to UEI and that Employee's employment creates a relationship of confidence and trust between Employee and UEI with respect to any information applicable to the business of UEI or applicable to the business of any customer of UEI which has been or may be known to Employee by UEI or by any such customer or has been or may be learned by Employee during the period of Employee's employment with UEI.  Employee possesses and had or will possess or have unfettered access to information that has been created, discovered, developed, acquired, or otherwise become known to UEI . . . and which has commercial value in the business in which UEI has been and will be engaged and has been and is treated by UEI as confidential.

For almost fifteen years, Dr. Duarte worked with UEI conducting research and revamping software programs and CNC milling machines.  In 2004, Dr. Duarte signed a Non-compete Agreement, which recites that:

> You acknowledge that: . . . (c) we compete with other businesses that are or could be located in any world location; and you agree that, during the period of your employment and during the five-year period after your employment ends . . . you will not, directly or indirectly: (a) Engage or invest in, own, manage, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, associated with, or in any manner connected with any business whose products or activities compete in whole or in part with the products or activities of [UEI].

In exchange for his signature, Dr. Duarte was given a 9.25% raise, which was not accounted for in the agreement, but was documented and recorded on his pay stubs.  Additional documentation

revealed that, over time, that 9.25% totaled $5,000.

While employed at UEI, Dr. Duarte took part in researching and developing innovative products and ideas dealing with processing specifically applied to UEI's machinery. For example, Dr. Duarte would authorize the purchase of raw materials used in the business. He would then synthesize those materials with other raw materials to suit UEI's needs. While working with machinery, Dr. Duarte would dissect machines purchased by the company and, with the aid of others, revamp those machines to create custom-made machinery. Most of Dr. Duarte's work, however, focused on developing software that would enable the most basic CNC milling machine to do things that it was not previously equipped or capable of doing. Dr. Duarte also took part in developing software to aid in the sale of UEI's products. One such software, permitted UEI to input information about a project, including the type of metal, the difficulty of the finished product, and the cost of certain materials used. After a calculation, the program would furnish a price quote for that product. The software was developed to respond to the world market, as it had a currency fluctuation device to calculate the price quote in different currencies.

*Months Leading up to Resignation*

In the months prior to his resignation, Dr. Duarte received a phone call from Metal Magic, Inc. ("Metal Magic"), a competitor of UEI, inquiring about his resume that was posted on www.monster.com.[1] Metal Magic offered to fly Dr. Duarte to Phoenix, Arizona to visit with Charlie Brown, the owner of the company. Thereafter, Dr. Duarte made a number of trips to

---

[1] Monster.com allows an individual to post his or her resume on its web page in hopes of having employers from around the country view it and respond.

Phoenix to visit with Mr. Brown to discuss employment, and to view Metal Magic's CNC milling machines.  Dr. Duarte and Mr. Brown corresponded back and forth through e-mail. Within weeks, Metal Magic offered Dr. Duarte a position within its company to take over the research and development of CNC milling machines.  Dr. Duarte accepted the position and drafted his resignation letter.

Prior to submitting his letter of resignation on May 21, 2007, Dr. Duarte entered UEI's facilities with his access card on Sunday, May 20, 2007.  He went to his office to obtain information from his computer and items from his office.  UEI contends that Dr. Duarte accessed UEI's computer system to obtain proprietary information, while Dr. Duarte claims that he only uploaded his photographs and pictures from the computer files.  There is also evidence that a Flash Drive or thumb drive[2] was installed on the computer and that a program called "GoToMyPc" was installed to enable a user to access the computer from other locations.  Upon handing in his resignation letter, which gave two-weeks notice, Dr. Duarte told the chairman of UEI that he was going to move back to Arizona and consider teaching.  After completing his final two weeks and orienting the other employees to his work and tasks left undone, Dr. Duarte sent an e-mail to "Everyone World Wide."  The e-mail detailed his accomplishments at UEI and explained to "everyone" all the areas of the company he was involved in.  The e-mail stated, among other things:

> I've had the opportunity to apply scientific principles mostly for
> Systems' products, processes, and assisted in Systems' customer
> training.  However, throughout my tenure, I have also left my mark
> in areas such as copper production, art development, art

---

[2]A thumb drive is a small USB port adapter, about the size of one's thumb, which can accommodate more that 1 gigabyte of information.

department, counters, shipping, environmental compliance, water
waste treatment (UEI has received numerous environmental
awards), and CNC (machining and programing).

*Work at Metal Magic, Inc*.

After leaving UEI, Dr. Duarte went to work for Metal Magic.  It was not long, however,

before UEI obtained information[3] that Dr. Duarte was working for its main competitor.  UEI sent

Dr. Duarte a letter on June 5, 2007, reminding Dr. Duarte that he was obligated under the

employment agreement to not compete or share UEI's confidential and proprietary information.

After confirming his employment with Metal Magic, UEI sent another letter on August 9, 2007,

requesting that Dr. Duarte respond to certain allegations made in the letter and to detail his

involvement with Metal Magic.  The same letter was also sent to Mr. Brown, and Metal Magic

responded through its attorneys, stating that the agreement between Dr. Duarte and UEI was

ineffective and unenforceable.

*Instant Proceedings*

UEI then filed a Complaint (Doc. 1), claiming breach of contract, violation of the

Computer Fraud and Abuse Act, breach of duty of loyalty, and an attached ex parte Motion for

Temporary Restraining Order (Doc. 2), which was denied (Doc.5).  The Court set the motion for

a TRO hearing on September 21, 2007, which did not conclude and was continued until

September 26, 2007.  On September 26, 2007, UEI modified its request to one for preliminary

injunction (Doc. 11), as extensive evidence was presented making the hearing more akin to a

---

[3]To confirm where Dr. Duarte was working, UEI executives simply e-mailed Dr. Duarte on his work e-mail.  After the message was viewed, the automatic function on the e-mail requiring notice to the sender that someone opened the e-mail sent UEI a message confirming that the Dr. Duarte's e-mail was in use.

preliminary injunction hearing than a TRO hearing.  After the hearings, the Court allowed the

parties to submit a brief detailing the evidence and their respective positions articulated at the

hearings.  In addition, UEI has moved to seal Dr. Duarte's Memorandum in Opposition (Doc.

16).

## II.   PRELIMINARY INJUNCTION STANDARD

"As preliminary injunction is an extraordinary remedy, the right to relief must be clear

and unequivocal."[4]  A party moving for a preliminary injunction must establish that:

> (1) [he or she] will suffer irreparable injury unless the injunction issues; (2) the
> threatened injury . . . outweighs whatever damage the proposed injunction may cause
> the opposing party; (3) the injunction, if issued, would not be adverse to the public
> interest; and (4) there is a substantial likelihood [of success] on the merits.[5]

In cases where the movant has prevailed on the other factors, the Tenth Circuit generally uses a

liberal standard for "probability of success on the merits," so the moving party need only raise

"questions going to the merits so serious, substantial, difficult and doubtful as to make them a

fair ground for litigation and thus for more deliberate investigation."[6]

### Irreparable Harm

"To constitute irreparable harm, a injury must be certain, great, actual 'and not

---

[4]*Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quoting *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991)).

[5]*Id.* (quoting *Heidman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003)).

[6]*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (applying standard articulated in *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980)).

theoretical.'"[7]  Irreparable harm is more than "merely serious or substantial" harm.[8]  This requirement is met by a plaintiff demonstrating that there is a significant risk of harm that cannot be cured by monetary damages.[9]  The party seeking the preliminary injunction bears the burden to show that "the injury complained of is of such imminence that there is a clear and present need for equitable relief."[10]  Irreparable harm is the most important factor in obtaining a preliminary injunction.[11]  "Loss of customers, loss of goodwill, and threats to a business' viability have been found to constitute irreparable harm."[12]  Unfair competition resulting from a breach of covenant not to compete is likely to constitute irreparable harm.[13]  On the other hand, wholly conclusory statements alone will not constitute irreparable harm.[14]

This Court finds that UEI has shown both an imminent threat of irreparable harm and that it has suffered irreparable harm thus far.  Dr. Duarte argues that UEI has not suffered irreparable harm because it cannot place a dollar figure on the harm caused by his actions.  Because the fact that UEI cannot announce a dollar amount in damages is one way to show irreparable harm, that

---

[7]*Heidman*, 348 F.3d at 1189 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir.1985)).

[8]*Id.* (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1235, 1250 (10th Cir. 2001)).

[9]*Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (citations omitted).

[10]*Heidman*, 348 F.3d at 1189.

[11]*Hill's Pet Nutrition, Inc. v. Nutro Prod., Inc.*, 258 F. Supp. 2d, 1197, 1205 (D. Kan. 2003).

[12]*Id.*

[13]*Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992).

[14]*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1261 (10th Cir. 2004).

statement fails to aid Dr. Duarte.[15]  Moreover, UEI's vice president, Jim Hutchison, testified that

information UEI considers proprietary was placed in Dr. Duarte's affidavit to this Court.  No

amount of monetary damages can make that information no longer public.[16]  Dr. Duarte is also

slated to conduct research and development on CNC milling machines at Metal Magic, and in

fact, has done some precursory viewing of Metal Magic's CNC milling machines.  This was

primarily the kind of research and development Dr. Duarte participated in during his fifteen

years with UEI.  Indeed, Dr. Duarte has compared Metal Magic's CNC milling machines with

those of UEI and has concluded that Metal Magic's machines are better.  With that, UEI's trade

secrets about the development of its CNC milling machines and programing of those machines

are at risk of imminent disclosure.[17]  "Certainly, if the disclosure allows a competitor to cut

corners in the research and development process . . ., the competitor will attain a competing

product . . . much sooner, and it is this harm . . . that is irreparable."[18]

### Balancing the Hardships/Public Interest

   After determining the harm that would be suffered by the moving party if the injunction

is not granted, the court must then weigh that harm against the harm to the defendant if the

---

[15]*Hill's Pet Nutrition, Inc.*, 258 F. Supp. 2d at 1205-06 (Citations omitted) (explaining that a harm is irreparable if money damages are an inadequate remedy because of difficulty or uncertainty in their proof or calculation).

[16]*Estee Lauder Co., Inc. v. Batra*, F. Supp. 2d 158, 174 (S.D.N.Y. 2006).

[17]*Id.* (explaining that "irreparable harm may be found based upon a finding that trade secrets will inevitably be disclosed .").

[18]*Interbake Foods, LLC v. Tomasiello*, 461 F. Supp. 2d 943, 975 (N.D. Iowa 2006) (explaining that the disclosure of trade secrets may cause irreparable harm).

preliminary injunction is granted.[19]  A balance of the hardships in this case tips in favor of UEI.

UEI has presented evidence that Dr. Duarte has knowledge of its intimate workings, including

trade secrets.  Dr. Duarte knows the functions and performance of UEI's machines and is able to

manipulate the programs and functionality to suit UEI's needs or, for that matter, another

company.  If this preliminary injunction is not granted, UEI may continue to suffer irreparable

harm due to disclosure of its confidential information.[20]

Dr. Duarte's claim, on the other hand, that he will suffer harm if he is unable to work and

support his family, is unfounded.  Dr. Duarte has presented this Court with no evidence that he

has tried to obtain other employment.  Furthermore, Dr. Duarte has a Ph.D. in chemistry,

necessarily establishing his qualifications for other positions.  Finally, a bond requirement

should adequately protect any damage to Dr. Duarte.  Therefore, UEI has shown that the harm to

Dr. Duarte is slight as compared to the harm to UEI.

Next, the Court considers the harm to the public interest if the preliminary injunction is

granted.  Generally, there is a public interest in upholding enforceable contracts.[21]  Moreover, the

public interest is served where unfair competition is restrained.[22]  UEI contends that the public

interest will not be harmed if a preliminary injunction is granted and this Court agrees.

---

[19]*Preminger v. Principi*, 422 F.3d 815, 823 (9th Cir. 2005); *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997); *Manning v. Hunt*, 119 F.3d 254 (4th Cir. 1997); *Aluminum Workers Intern. Union, AFL-CIO, Local Union no. 215 v. Consol. Aluminum Corp.*, 696 F.2d 437, 444 (6th Cir. 1982).

[20]*Nike, Inc. v. McCarthy*, 379 F.3d 576, 587 (9th Cir. 2004) (a party can show potential harm of unfair competition where former employer has knowledge of confidential information peculiar to his former employer's products).

[21]*Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 86 F. Supp. 2d 1102, 1109 (D. Kan. 2000); *Hearton, Inc. v. Shackelford*, 898 F. Supp. 1491, 1502 (D. Kan. 1995).

[22]*Shackelford*, 898 F. Supp. at 1502; *Am. Fid. Assurance Corp. v. Leonard*, 81 F. Supp. 2d 1115, 1121 (D. Kan. 2000).

**Likelihood of Success on the Merits**

There are three types of injunctions that are disfavored in the Tenth Circuit, and thus, are subjected to a heightened burden.  Those injunctions are: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.[23]  If an injunction falls into one of these categories, it "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course.  Furthermore . . . movants seeking such an injunction are not entitled to rely on this Circuit's modified-likelihood-of-success-on-the-merits standard."[24]  "Instead, a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms . . . ."[25]

Dr. Duarte argues that the heightened burden should apply in this case.  Dr. Duarte contends that this Court should require UEI to prove that each factor of the a preliminary injunction weighs "heavily and compellingly" in UEI's favor because UEI seeks all the relief it could recover after a trial on the merits.  This Court disagrees.

First, the Court notes that Dr. Duarte is using an erroneous standard.  The language "heavily and compellingly" was discarded in *O Centro Espirita Beneficiente Uniao Do Vegetal*

---

[23]*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 389 F.3d 973, 975 (10th Cir. 2004) (per curiam), *aff'd*, 126 S. Ct. 1211 (2006); *see also Schrier* v. *Univ. of Colo.*, 427 F.3d 1253, 1258-59 (10th Cir. 2005).

[24]*O Centro*, 389 F.3d at 975–76.

[25]*Id.* at 976.

*v. Ashcroft*,[26] where the en banc Court of Appeals for the Tenth Circuit stated that "the en banc court does, however, jettison that part of *SCFC ILC* which describes the showing the movant must make in such situations as 'heavily and compellingly.'"[27]  Second, this Court does not believe that it is granting all the relief sought by UEI.  The relief sought by UEI is an injunction pending the resolution of the trial, compensatory damages for breach of contract, breach of loyalty, and for violation of the Computer Fraud and Abuse Act ("CFAA").  Therefore, if the outcome of the case falls in Dr. Duarte's favor, he would have been enjoined for the period it took to litigate.[28]

> A.    *Breach of Employment Agreement*

Although Dr. Duarte admits that he is in violation of the agreement, he contends that the agreement is unenforceable for a number of reasons.  Generally, Kansas courts have routinely recognized the validity of covenants not to compete ancillary to an employment contract if the covenant is reasonable and not adverse to the public interest.[29]  "Freedom of contract is the driving force behind finding such covenants enforceable."[30]  In *Weber v. Tillman*,[31] the Kansas Supreme Court set out the following four factors to guide a court's decision on whether a non-

---

[26] 389 F.3d 973 (10th Cir. 2004).

[27] *Id.* at 975.

[28] *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1235, 1248 (10th Cir. 2001) (explaining that if the Tribe was not successful at trial it would lose its temporary recognition of its vehicle registration and title); *see also Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988) (holding that a preliminary injunction which preserves the rights of the plaintiff pending resolution does not grant all the relief sought).

[29] *Idbeis v. Wichita Surgical Specialists, P.A.*, 112 P.3d 81, 86-7 (Kan. 2005)*; Varney Bus. Servs., Inc. v. Pottroff*, 59 P.3d 1003, 1014-15 (Kan. 2002).

[30] *Pottroff*, 59 P.3d at 1015.

[31] 913 P.2d 84 (Kan. 1996).

compete covenant is enforceable: "(1) Does the covenant protect a legitimate business interest?

(2) Does the covenant create an undue burden on the employee? (3) Is the covenant injurious to

the public welfare? (4) Are the time and territorial limitations contained in the covenant

reasonable?"[32]  Reasonableness is determined based on the facts and circumstances of each

case.[33]  Additionally, non-compete covenants are strictly construed against the employer.[34]  The

Court will discuss each factor in turn.

### Trade Secrets-A Legitimate Business Interest

Dr. Duarte contends that UEI has not brought forth enough evidence, nor has it met the

standards announced in *Koch Engineering Company, Inc. v. Faulconer*,[35] to determine if it has

any trade secrets.  The existence of a trade secret is an issue for the trier of fact.[36]  Merely

alleging that there is a trade secret is not enough—sufficient facts must be set forth to describe

the subject matter and to establish each element of the claim.[37]  A trade secret is defined as:

> information, including a formula, pattern, compilation, program,
> device, method, technique, or process, that:
> (i) derives independent economic value, actual or potential, from
> not being generally known to, and not being readily ascertainable
> by proper means by, other persons who can obtain economic value

---

[32]*Id. at* 90; *see also* Mike J. Wyatt, Comment, *Buy Out or Get Out: Why Covenants Not to Compete in Surgeon Employment Contracts is Bad Medicine,*[Idbeis v. Wichita Surgical Specialists, P.A., 112 P.3d 81 (Kan. 2005)], 45 WASHBURN L.J. 715, 724-25 (Spring 2006).

[33]*Weber*, 913 P.2d at 90.

[34]*Id*. at 89.

[35]610 P.2d 1094 (Kan. 1980).

[36]*Dodson Intern. Parts, Inc. v. Altendorf*, 347 F. Supp. 2d  997, 1010 (D. Kan. 2004) (citing *Fireworks Spectacular*, Inc. v. *Premier Pyrotechnics*, 147 F. Supp. 2d 1057, 1065 (D. Kan. 2001)).

[37]*Id.*

> from its disclosure or use, and
> (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[38]

This Court notes that *Faulconer* was decided before the Uniform Trade Secrets Act was adopted in Kansas; thus the statute, not *Faulconer,* is the appropriate standard.  Applying the statute, this Court finds that UEI's evidence shows that its confidential and proprietary information are trade secrets.

First, UEI has established that it has developed formulas that are required to operate some of its software.  Most notably, UEI has explained to the Court one aspect of its coveted information—the Uniquote program.  The Uniquote program allows UEI's sales group to input information into a program that is then calculated to yield a price quote in different currencies. Furthermore, as Jim Hutchison testified, UEI is unique in its development of its machinery.  UEI purchases market machinery from specified vendors and then revamps those parts to create its own unique piece of equipment.[39]  The process of developing the equipment is a trade secret for purposes of the statute and Dr. Duarte was privy to that information.  Indeed, he was a mainstay in the development of many of UEI's technology and software.  Moreover, as a business, it cannot be said that UEI does not gain economic value from its research and development on these products, as UEI has spent over three million dollars on research and development in the

---

[38]K.S.A. § 60-3320 (2006).

[39]*See Mettler-Toledo, Inc. v. Acker*, 908 F. Supp. 240, 247 (M.D. Penn. 1995) (explaining that "the fact that individual pieces of information claimed to be confidential are available to the general public does not defeat a claim of confidentiality if the value of the information stems from its compilation . . . in a particular form for which is of value."); *All West Pet Supply Co. v. Hill's Pet Prod. Div., Colgate-Palmolive Co.*, 840 F. Supp. 1433, 1438 (D. Kan. 1993) (explaining that "trade secrets often contain elements that by themselves may be in the public domain, but together nevertheless qualify as trade secrets.") (citing *Servo Corp. of Am. v. Gen. Elec. Co.*, 393 F.2d 551 (4th Cir. 1968)).

past six years.  Finally, UEI has expended much effort in keeping its confidential information secret.  UEI utilizes confidential employment agreements, access cards to the buildings, password protected computers, and restricts access to the research and development building.  In addition, Mr. Hutchison testified that the company is so sincere about keeping its secrets that he has never been in a particular part of the research and development room.  Thus, it cannot be said that UEI does not have trade secrets, as all trade secrets are necessarily made from items in the public; it is not the items in the public that make the trade secret, but the compilation of those items once UEI obtains then for its purposes.[40]

Injury to the Public

Dr. Duarte claims the covenant is unreasonable because it seeks to avoid ordinary competition.  Only a legitimate business interest may be protected by a non-compete covenant.[41]  Where a covenant seeks to avoid competition, the covenant will be void.  At the onset, this Court points out that the agreement between Dr. Duarte and UEI protects a legitimate business interest.[42]  Kansas Courts recognize that employers have an interest in protecting trade secrets and preventing unfair competition.[43]  The Kansas Supreme has stated that where the "'contract is not violative of any positive statute or well-established rule of law[,] [i]t is the duty of the courts to sustain the legality of contracts . . . when fairly entered into . . . rather than to seek loopholes

---

[40]K.S.A. § 60-3320.

[41]*Bruce D. Graham, M.D., P.A. v. Cirocco*, 69 P. 3d 194, 198 (Kan. App. 2003).

[42]*Weber v. Tillman*, 913 P.2d 84, 91 (Kan. 1996) (explaining that an employer has a legitimate business interest in protecting trade secrets and confidential information).

[43]*Idbeis v. Wichita Surgical Specialists, P.A.*, 112 P.3d 81 , 89 (Kan. 2005).

and technical legal grounds for defeating their intended legal purpose.'"[44] Additionally, the

Kansas Supreme Court noted, freedom of contract is paramount public policy.[45]

With that, this Court finds that the agreement between Dr. Duarte and UEI does not

contravene public policy on its face.  Rather, the agreement seeks to protect UEI's trade secrets

and market presence from unfair competition.  Dr. Duarte argues, however, that because UEI did

not sue former employees who left and started their own business, UEI is picking who to sue

based on the size of the competitor.  Though Dr. Duarte may be correct that UEI did not sue

former employees, UEI had the right to sue them and has the right to sue Dr. Duarte.  The fact

that UEI chose to sue Dr. Duarte does not make the purpose of the covenant in the agreement

intended for the restriction of competition.

<u>Geographical and Temporal Scope</u>

Dr. Duarte contends that the scope of the agreement is unreasonable because it provides

for a world-wide prohibition for five years. To be reasonable, the geographic and temporal

restrictions of a covenant not to compete "must be no greater than necessary to protect the

employer's interest."[46]  As stated above, when deciding whether a non-compete covenant is

reasonable, a court must look to the circumstances and facts of the case.  Dr. Duarte asserts that

there are no cases in Kansas upholding such a broad and restrictive covenant.  UEI also concedes

that there are no cases in Kansas that extend the restriction on non-compete covenants this far,

but cite a number of cases from other jurisdictions that have upheld a world-wide restriction and

---

[44]*Weber*, 913 P.2d at 89 (quoting *Foltz v. Struxness*, 215 P.2d 133, 139 (Kan. 1950)).

[45]*Id.*

[46]*Id.* at 91.

others that have upheld a temporal scope of five years or more.  None of the cases cited by UEI

for the proposition that such a temporal and geographic scope is valid have both the temporal

and geographic scope present in the agreement between Dr. Duarte and UEI.  For example, in

*Este Lauder Companies, Inc. v. Batra*,[47] the court upheld a world-wide restriction between Batra

and his former company Este Lauder.  In the agreement between Batra and Este Lauder, Batra

agreed not to compete with Este Lauder by going to any competitor in which he could benefit the

competitor.[48]  Furthermore, Batra's agreement provided that Batra would be restricted for twelve

months and only in those geographic areas where he worked in his last twelve months of

employment.[49]  Because Batra was an executive who performed his duties world-wide, the court

upheld the world-wide geographic restriction, but reduced the temporal restriction to five

months.[50]

　　　　Like Batra, Dr. Duarte performs his duties world-wide.  Dr. Duarte was involved in the

customer relations world-wide, research and development, and many other aspects of UEI's

business, as he proclaimed in his e-mail to "Everyone World-Wide."  Furthermore, as Mr.

Hutchison testified, some of UEI's confidential information can be utilized through using a

computer to transport the information, thus giving the information an easy route to travel world-

wide, even if Dr. Duarte did not move to another country.  Finally, UEI's products reach world-

wide customers with its location in Europe. Considering the small market of companies that

---

[47]430 F. Supp. 2d 158 (S.D.N.Y. 2006).

[48]*Id.* at 162.

[49]*Id.*

[50]*Id.* at 181.

engage in this unique field, Dr. Duarte could only go to handful of companies to compete with UEI. Thus, the world-wide restriction is not patently unreasonable.

The temporal scope of the agreement is questionable, however, and it seems UEI concedes that the five year restriction is over-broad. In its memorandum, UEI relies on the court's equitable power to sever the unreasonable restriction from the agreement and replace it with a reasonable restriction. Here, in light of the evidence adduced at the hearing, the Court is constrained to find that the five year restriction is unreasonable. But in light of the issues and the injury at stake for UEI if Dr. Duarte is not enjoined, the Court is inclined to amend the restriction to two years.[51] Such a restraint in this matter is reasonable, in light of both Kansas case law[52] and the broad geographical scope of the agreement. And, because the field of engraving builds upon past technology and past developments, two years is a reasonable period of time for the wave of technology in this field to change. Additionally, the impact on Dr. Duarte is assuaged by the bond requirement of Fed. R. Civ. P. 65(c), discussed further below. After reviewing the evidence and submissions by the parties, this Court concludes that UEI has met its burden of showing that there are "questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation" with respect to the enforceability of the agreement.

B.     *Misappropriation of Trade Secrets*

Misappropriation of a trade secret occurs when the trade secret is disclosed or used

---

[51]*Bruce D. Graham, M.D., P.A. v. Cirocco*, 69 P. 3d 194, 200 (Kan. App. 2003) (explaining that the Kansas Supreme Court has upheld the modification of a non-compete covenant).

[52]*Weber v. Tillman*, 913 P.2d 84, 90 (Kan. 1996) (upholding a two year restriction); *Uarco, Inc. v. Eastland*, 584 F. Supp. 1259, 1263 (D. Kan. 1984) (same).

without express or implied consent by a person who "used improper means to acquire knowledge of the trade secret," or by a person who "at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use."[53]  "Actual or threatened misappropriation may be enjoined."[54]

Again, it can hardly be said that Dr. Duarte did not know that he was under an obligation to maintain the secrecy of UEI's trade secrets.  Not only did Dr. Duarte sign the confidentiality agreement and then knowingly breach it, he signed additional confidentiality agreements with every meeting of employees.  Additionally, he worked with UEI for almost fifteen years in research and development and accumulated an abundance of UEI's proprietary information, some of which Dr. Duarte himself stamped "confidential."  Furthermore, Dr. Duarte was involved in almost every aspect of UEI's business, as he stated in his e-mail addressing "Everyone World-Wide."  Dr. Duarte disclosed part of UEI's confidential information in his affidavit attached to his response to UEI's TRO Motion, wherein he discussed direct-to-plate-imaging and LErgoCAD.  Though LergoCAD is a market item, it forms a part of UEI's products used to create and redesign its trade secrets.  And, direct-to-plate imaging is an innovative way of doing engraving work thought not to be feasible.  Finally, Dr. Duarte testified that he has compared CNC milling machines at Metal Magic with those of UEI, necessarily requiring the use of UEI's methods and procedure in developing its CNC milling machines.  Thus, this Court finds that it is likely that UEI will succeed on its misappropriation of trade secret claim because

---

[53]K.S.A. § 60-3320(2)(ii)(A), (B)(II) (2006).

[54]K.S.A. § 60-3321(a) (2006).

there are serious questions going to the merits so substantial to make them fair grounds for litigation.

C.    *Duty of Loyalty*

Under Kansas law, agents are fiduciaries who must "act solely for the benefit of the employer in all matters within the scope of the employee's employment, and . . . avoid conflicts between their duty to the employer and their own self-interest."[55]  The agent or employer has a duty to "act in good faith and with loyalty to further advance the interests of the principal."[56] "An agent or employee of another is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties."[57]  By surreptitiously obtaining the employer's equipment, an employee has violated that duty of good faith and loyalty.[58]  Similarly, an agent who competes with his principal during the agency violates his fiduciary duties.[59]

Here, this Court concludes that UEI is likely to succeed on the merits of whether Dr. Duarte violated his fiduciary duties.  First, UEI presented evidence that Dr. Duarte, in violation of UEI's computer policy, downloaded information from UEI's computer system.  Dr. Duarte admitted to using the computer for his personal photos and music, but claimed that he did not upload information from the system onto a thumb drive.  However, UEI provided evidence that Dr. Duarte's computer was accessed on Sunday, May 20, 2007, at 11:49 p.m.—one day before

---

[55]*FryTech, Inc. v. Harris*, 46 F. Supp. 2d 1144, 1152 (D. Kan. 1999).

[56]*Id.* (citing *Henderson v. Hassur*, 594 P.2d 650, 659 (Kan. 1979)).

[57]*Id.* (citations omitted).

[58]*Id.*

[59]*Id.* (citing *Burton Enter. v. Wheeler*, 6 F. Supp. 588 (D. Kan. 1986)).

Dr. Duarte turned in his resignation—and thus, while he was still an agent of UEI.  Second, to make Dr. Duarte's actions more suspicious, he was at the office on a Sunday.  After checking the computer access card files noting the days and times each employee's card was used to access the building, UEI found that Dr. Duarte had not been in to work on a Sunday in the past year.  Third, further computer forensic testing found that a USB Flash Memory and CDROM (thumb drive) was attached to UEI's computer system and last written on May 21, 2007, the day Dr. Duarte turned in his resignation.  Though the evidence is by no means conclusive, it does present questions so serious, difficult, and substantial going to the merits to make it a fair ground for litigation.

      D.    *Violation of Computer Fraud and Abuse Act*

Violation of the CFAA occurs when a person:

> (5)(A)(I) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;
> (ii) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or
> (iii) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage; and
> . . . (I) loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value.[60]

UEI argues that Dr. Duarte may have violated this statute because he came in on a Sunday, forensic computer tests reveal that someone was on Dr. Duarte's pass code protected computer, and because he placed a flash drive on the computer to upload personal information.  Dr. Duarte does not offer any evidence to the contrary except his testimony that he did not upload any

---

[60] 18 U.S.C. § 1030 (a)(5)(A)(i)-(B)(i) (2006).

confidential information nor place the GoToMyPc on the computer to gain access away from work.  The evidence offered by UEI is more persuasive.  First, Dr. Duarte testified that he placed a thumb drive on the computer that Sunday when he entered the building.  Second, Dr. Duarte testified that the only explanation he could fathom for the upload of one of UEI's proprietary programs was that someone else was using his computer at 11:40 p.m. that night, the recorded time of the upload.  The Court finds none of this testimony credible, considering that Dr. Duarte changed his story on the witness stand after cross examination and made misstatements in his affidavit to this Court.  Additionally, as UEI need not prove its case at this stage of the proceedings, but merely show that the likelihood of success on each claim is in its favor, the Court finds that UEI has met its burden.

**Bond Requirement**

Fed. R. Civ. P. 65(c) requires a plaintiff to post a bond in an amount the Court deems appropriate to protect the defendant from losses and damages if, in the end, he was wrongly enjoined.  UEI has offered to post a bond in the amount of $70,000.  The Court, however, has the discretion to dispense with the bond where the applicant for the injunction has "considerable assets" and is "able to respond in damages" if the defendant is wrongly enjoined.[61]  This case, however, requires a bond sufficient enough to protect Dr. Duarte against damages resulting from lost wages.  As Dr. Duarte's salary is $70,000, the Court finds that a bond in an amount of his salary for each year is proper.  Thus, a $140,000 bond should be sufficient to protect Dr. Duarte if, in the end, he is wrongly enjoined.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff's Motion for

---

[61]*Monroe Div., Litton Bus. Sys., Inc. v. De Bari*, 562 F.2d 30, 32 (10th Cir. 1977).

Preliminary Injunction (Doc. 11) is **GRANTED**.

   **IT IS FURTHER ORDERED** that Dr. Duarte is enjoined from:

   (1) engaging in all activities prohibited by his employment agreement;

   (2) disclosing UEI's confidential information not already known to the public, and trade secrets including, but not limited to, information concerning UEI's manufacturing or process improvements, processes, formulae, software, documentation, data, improvements, discoveries, inventions, techniques, marketing plans and methods, product information, business and financial information, forecasts, new products, licenses, prices, acquisitions, prices, artistic designs, costs and customer supplier lists, or any customers of UEI;

   (3) engaging in, financing, investing in, managing, operating, controlling, participating in the ownership, management, operation, financing, or control of any association, business, or corporation, connected to or associated with UEI, Metal Magic, or any other engraving companies or organizations;

   (4) soliciting any customer, client, or business of the same type as UEI, Metal Magic, or any other engraving companies or organizations;

   (5) indirectly or directly soliciting, interfering with, or employing the employees of UEI, Metal Magic, or any other engraving companies or organizations; and

   (6) working with, consulting, aiding, researching, any CNC machinery, program, software, or equipment of UEI, Metal Magic, or any other engraving companies or organizations.

   **IT IS FURTHERED ORDERED** that plaintiff, UEI, is required to deposit the amount of $140,000, into the Clerk of the Court to serve as security pursuant to Fed. R. Civ. P. 65(c) within fourteen days of the date of this Order

**IT IS FURTHER ORDERED** that UEI's Motion to Seal Document 9 (Doc. 16) is

**GRANTED**.

**IT IS SO ORDERED**.

Dated this 16th day of October 2007.

S/ Julie A. Robinson

**Julie A. Robinson**
**United States District Judge**