kaw

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **UNIVERSAL ENGRAVING, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | |
| ) | **Case No. 07-2427-JAR** |
| ) | |
| **FREDERICK DUARTE, PH.D.** ) | |
| ) | |
| **Defendant.** ) | |
| _____) | |

## MEMORANDUM AND ORDER

Before the Court is plaintiff Universal Engraving, Inc.'s ("UEI") Motion for Damages

Hearing (Doc. 57).  On November 13, 2008, the Court heard testimony and received evidence on

UEI's damages.  For the reasons detailed below, judgment is entered against defendant Dr.

Frederick Duarte.

## 1.    Background

UEI is an employee stock ownership plan ("ESOP") company in the business of

engraving and embossing.  Since it was founded in 1971, UEI  has grown extensively, serving a

customer base that includes Europe and the Americas.  Engraving is quite the complicated feat.

Over the years, UEI has invested in engraving technology techniques developed both within and

outside of its walls.  Typically, the engraving is done by: (1) hand engraving; (2) photoetching

using chemicals to erode certain portions of the metal; (3) mechanical engraving by manually

operated milling machines; or (4) mechanical engraving through computer numerical control

("CNC") milling equipment.  Most CNC milling equipment functions with software programs

designed by various vendors.  But UEI purchases software programs that are rewritten or customized to meet UEI's designs, purposes and goals.

Over the years, UEI has developed not only software, but has redesigned most of its CNC milling machines to its specific needs.  UEI generally purchases CNC milling machines from suppliers and revamps those machines with parts bought from various suppliers.  After placing the parts together with the adaptive software that UEI either improves or edits, the machines are then programmed to complete certain tasks as required by UEI.  Notably, UEI considers its processes and programs so secretive that it rids most equipment coming in its doors of any brand markings.  Thus, employees are not aware of what brand of equipment is being used.  UEI takes other protective measures, including: (1)  requiring all of its employees to enter into confidentiality agreements; (2) restricting employee acdess to UEI's computers, via passwords; and (3) restricting  employees' access  to certain facilities.  One such facility is the research and development building, which is locked twenty-four hours per day and limited to employees with authorized access cards.

Dr. Frederick Duarte began his career with UEI  as a research chemist in 1992.  Before starting work, Dr. Duarte signed a Confidentiality and Proprietary Rights Agreement wherein he promised to keep confidential all of UEI's proprietary information, including formulae, software, documentation, data, programs, trade secrets, and discoveries.  In 2004, Dr. Duarte signed a Non-compete Agreement; in exchange UEI gave Dr. Duarte a 9.25% raise, which although not accounted for in the agreement, was documented and recorded on his pay stubs.

For almost 15 years Dr. Duarte was employed by UEI, conducting research, customizing software programs and revamping and redesigning the CNC milling machines UEI used for

engraving.  Among his many duties and responsibilities, Dr. Duarte authorized the purchase of

raw materials and synthesized those materials with other raw materials to suit UEI's needs.  Dr.

Duarte also dissected, revamped and customized machines purchased by UEI.   Most of Dr.

Duarte's work, however, focused on developing software that would enable the most basic CNC

milling machine to do things that it was not previously equipped or capable of doing.  Dr. Duarte

also took part in developing software to aid in the sale of UEI's products.  One such software

that Dr. Duarte developed, calculated a price quote for any given product, and had a currency

fluctuation device allowing for calculation of a price quote in different currencies.

In the months prior to his resignation, Dr. Duarte received a phone call from Metal

Magic, Inc. ("Metal Magic"), a competitor of UEI, inquiring about his resume that was posted on

www.monster.com.[1]  Metal Magic offered to fly Dr. Duarte to Phoenix, Arizona to visit with

Charlie Brown, the owner of the company.  Thereafter, Dr. Duarte made a number of trips to

Phoenix to visit with Mr. Brown to discuss employment, and to view Metal Magic's CNC

milling machines.  Dr. Duarte and Mr. Brown corresponded back and forth through e-mail.

Within weeks, Metal Magic offered Dr. Duarte a position within its company to take over the

research and development of CNC milling machines.  Dr. Duarte accepted the position and

drafted his resignation letter.

Prior to submitting his letter of resignation on May 21, 2007, Dr. Duarte entered UEI's

facilities with his access card on Sunday, May 20, 2007.  He went to his office to obtain

information from the UEI computer and to obtain other items located in his office.  Dr. Duarte

accessed UEI's computer system to obtain proprietary information.  The evidence establishes

---

[1]Monster.com allows an individual to post his or her resume on its web page in hopes of having employers
from around the country view it and respond.

that a Flash Drive or thumb drive[2] was installed on the computer and that a program called "GoToMyPc" was installed to enable a user to access the computer from other locations.  Upon handing in his resignation letter, which gave two weeks notice, Dr. Duarte told the chairman of UEI that he was going to move back to Arizona and was considering teaching.  After completing his final two weeks and orienting the other employees to his work and uncompleted tasks, Dr. Duarte sent an e-mail to "Everyone World Wide."  The e-mail detailed his accomplishments at UEI and explained to "everyone" all the areas of the company he was involved in.  After leaving UEI, Dr. Duarte went to work for Metal Magic.  It was not long, however, before UEI obtained information[3] that Dr. Duarte was working for its main competitor.  UEI sent Dr. Duarte a letter on June 5, 2007, reminding Dr. Duarte that he was obligated under the employment agreement to not compete or share UEI's confidential and proprietary information.  After confirming his employment with Metal Magic, UEI sent another letter on August 9, 2007, requesting that Dr. Duarte respond to certain allegations made in the letter and to detail his involvement with Metal Magic.  The same letter was also sent to Mr. Brown, and Metal Magic responded through its attorneys, stating that the agreement between Dr. Duarte and UEI was ineffective and unenforceable.

UEI then filed a Complaint (Doc. 1), claiming breach of contract, violation of the Computer Fraud and Abuse Act, breach of duty of loyalty, and an attached ex parte Motion for Temporary Restraining Order (Doc. 2), which was denied (Doc.5).  The Court set the motion for

---

[2]A thumb drive is a small USB port adapter, about the size of one's thumb, which can accommodate more than one gigabyte of information.

[3]To confirm where Dr. Duarte was working, UEI executives simply e-mailed Dr. Duarte on his work e-mail.  After the message was viewed, the automatic function on the e-mail requiring notice to the sender that someone opened the e-mail sent UEI a message confirming that the Dr. Duarte's e-mail was in use.

a TRO hearing on September 21, 2007, which did not conclude and was continued until September 26, 2007.  On September 26, 2007, UEI modified its request to one for preliminary injunction (Doc. 11), as extensive evidence was presented making the hearing more akin to a preliminary injunction hearing than a TRO hearing.  The Court granted UEI's Motion for a Temporary Restraining Order October 16, 2007. (Doc. 17).

Since October 16, 2007, Dr. Duarte has filed a notice of default, stating that he can no longer afford to defend against this action.  Dr. Duarte's attorney withdrew from this action on May 2, 2008.  Subsequently, Dr. Duarte's attorney entered a limited entry of appearance to be present for Dr. Duarte's deposition.  The Court granted the motion, but required Dr. Duarte's attorney to file a motion to withdraw immediately preceding the deposition.  No such motion has been filed.  Dr. Duarte was deposed on June 2, 2008.

In his deposition, Dr. Duarte admitted that there was a contract between he and UEI.  Dr. Duarte admitted that he violated the employment agreement with UEI by accepting employment with a competitor, Metal Magic, Inc.  Dr. Duarte admitted that while still employed by UEI, he accepted a position with Metal Magic to serve as Research Director, the same position he served with UEI.  He further admitted that after accepting the position with Metal Magic, he installed a flash drive onto the computer system at UEI to retrieve information .  Dr. Duarte claims that he has since misplaced the flash drive.  In addition, Dr. Duarte testified that he does not intend to continue in the engraving business even though he has had substantial contacts with Metal Magic since the issuance of the Temporary Restraining Order.

## II.    Damages for Misappropriation of Trade Secrets

Under the Kansas Uniform Trade Secrets Act ("KUTSA"), "a complainant is entitled to

recover damages for misappropriation."[4]  "[T]he damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret" or by calculating the actual loss caused by misappropriation.[5] Alternatively, damages can be calculated by determining the unjust enrichment to the misappropriator.[6]  There is no doubt that Dr. Duarte has misappropriated UEI's trade secrets; the only issue is the nature and amount of damages.

Providing evidence detailing its expenditures for research and development over the past fifteen years, UEI argues that its actual loss is over eleven million dollars. Glen E. Hutchinson of UEI testified that the actual cost of UEI's research and development for the 15 years Dr. Duarte worked for the UEI totals $9,852,021.00.  Mr. Hutchinson further testified that the rate of return on the $9,852,021.00 is $1,682,725.19 for a total current value of $11,534,746.19.

Mr. Hutchinson reached the eleven million dollar figure by using fiscal year end investment into research and development.  He calculated the rate of return on each year by relying on the Bureau of Economic Analysis ("BEA") with the United States Department of Commerce.  The rate of return on any year's investment, explained Mr. Hutchinson, may provide a benefit to the company for many years; however, he decided that a rate of return for one year on each year's investment into research and development was adequate.  For example, in year 2006 UEI invested $463,345.00 in research and development.  Using the BEA rate of return 17.08%, Hutchinson concluded that UEI received a $79,139.33 return on its investment, yielding

---

[4]K.S.A. § 60-3322(a).

[5]K.S.A. § 60-3322(a).

[6]K.S.A. § 60-3322(a).

a current value of $542,484.33.  Hutchinson did this calculation for fifteen years, the time Dr.

Duarte worked for the company, and then totaled the yearly amounts for a grand total of

$11,534,746.19.

However, a detailed look at Mr. Hutchinson's evaluation gives the Court pause.  In fiscal

years 1993 through 1999, UEI did not file for tax credit based on its research and development

and therefore was unable to give the Court a definitive expenditure on research and development

for that year.  In fiscal years 2000 through 2006, UEI filed taxes and sought tax credit based on

actual investments into research and development.  Taking those actual investments and the BEA

rate of return, a current value of $6,049,221.54.  Because the definitive numbers on Mr.

Hutchinson's exhibit 1 are those for years in which research and development tax credit was

received, the actual damage after the BEA rate of return calculation for Dr. Duarte's

misappropriation of UEI's trade secrets is $6,049,221.54.

### III.   Exemplary Damages

UEI also seeks exemplary damages.  Under the KUTSA, "[i]f willful and malicious

misappropriation exists, the court may award exemplary damages in an amount not exceeding

twice any award made under subsection (a)."[7]  Whether to award exemplary damages is within

the discretion of the court.[8]  In determining exemplary damages, courts generally consider:

> (1) The likelihood at the time of the alleged misconduct that
> serious harm would arise from the defendant's misconduct; (2) the
> degree of the defendant's awareness of that likelihood; (3) the
> profitability of the defendant's misconduct; (4) the duration of the
> misconduct and any intentional concealment of it; (5) the attitude

---

[7] K.S.A. § 60-3322(b).

[8] *Biocare, Inc. v. Khosrowshahi*, No. Civ. A. 98-2031-KHV, 2004 WL 303194, at *4 (D. Kan. Feb. 2, 2004).

and conduct of the defendant upon discovery of the misconduct;
(6) the financial condition of the defendant; and (7) the total
deterrent effect of other damages and punishment imposed upon
the defendant as a result of the misconduct, including, but not
limited to, compensatory, exemplary and punitive damage awards
to persons in situations similar to those of the claimant and the
severity of the criminal penalties to which the defendant has been
or may be subjected.[9]

Here, the uncontroverted facts are that Dr. Duarte acted wilfully and maliciously in
misappropriating UEI's information. The undisputed facts are that Dr. Duarte accumulated
fifteen years of research and development experience with UEI, and then accepted a position
with UEI's competitor, Metal Magic. Dr. Duarte subsequently uploaded information from UEI's
computer system, and undoubtedly has shared UEI's proprietary information. Dr. Duarte
possessed and had access to UEI proprietary information at the time he downloaded information
on his flash drive. Indeed, Dr. Duarte was intimately involved in the research, development,
design and customization of software and retooling of machinery for UEI. It is clear that Dr.
Duarte was substantially involved in creating and using proprietary information owned by UEI.
This proprietary information was  inextricably intertwined with other working knowledge Dr.
Duarte used in the scope of his work for UEI. The Court finds it impossible and incredible that
in his position as director of research and development for Metal Magic, Dr. Duarte has not
relied upon, utilized and shared proprietary information owned by UEI.

Third, as detailed above, UEI spent millions in its research and development over the
years and any proprietary information that would be revealed to Metal Magic would most likely
yield some profit to Dr. Duarte and Metal Magic. Certainly, Metal Magic would not have been

---

[9]K.S.A. § 60-3702(b).

attracted to Dr. Duarte's resume had it not show his fifteen years of experience in its competitors' research and development department.  Fourth, Dr. Duarte accepted a position with a competitor in violation of his employment agreement while still employed by UEI, and continued to disobey the Court's Order requiring him to abide by the terms of the employment agreement.  In fact, Dr. Duarte admitted that he knowingly violated his agreement with UEI and has never returned the flash drive containing UEI's information, claiming he has misplaced it.  In addition, Dr. Duarte stands to make a substantial profit from the information acquired, as again, Metal Magic would not have hired the scientist if he had not acquired the fifteen years of experience with UEI..

In this case, the Court is of the view that an award of exemplary damages in the amount of $5,485,524.65 is appropriate.  This figure is taken from UEI's analysis of its rate of return on each year's research and development investment of tax years in which there was no tax credit received.  This amount is reasonable in light of the factors enumerated in K.S.A. § 60-3702(b) and in light of Dr. Duarte's conduct because it provides adequate deterrent effect, is in line with the compensatory damages granted, and provides the necessary punishment for Dr. Duarte's malicious conduct and continued violation of the Court's Order.  It also follows with Mr. Hutchinson's testimony that investments in UEI's Research and Development generally yield benefit for many years to come, even if at a depreciated value.   Furthermore, Mr. Hutchinson testified that for the years 1993 through 1999, which no tax credit was received, the company engaged in substantial research and development and the figures offered on exhibit 1 were modest estimates of each of those years investment in research and development.

**IV.    Damages for Breach of Employment Contract**

9

In its Order on Summary Judgment (Doc. 66), the Court concluded that there was a enforceable agreement between UEI and Dr. Duarte as amended by the Court.  As such, the court will grant UEI's claim for injunctive relief as to the terms of the agreement as amended in this Court's Order.

## V.      Damages for Breach of the Duty of Loyalty

The relationship between a principal and agent is a fiduciary one requiring conditions of trust and loyalty.[10]  Where it has been determined that "an agent realizes a secret profit through his dealings on behalf of his principal [the agent] not only must disgorge the profit[,] but [he must] forfeit[] the compensation he would otherwise have earned."[11]  In this case, it is undisputed that Dr. Duarte used his access card to enter UEI's facilities and upload information from its servers onto a flash drive.  It is also undisputed that Dr. Duarte accepted employment with Metal Magic and even continued negotiations while under a Court Order to refrain from such actions. During the five months prior to Dr. Duarte's resignation, he earned $26,441.59 in total compensation.  As the Court has already discussed, no evidence was offered as to any profits made by Dr. Duarte; accordingly, an award of $26,441.59 is an appropriate amount for breach of loyalty.

## VI.      Attorney's Fees and Costs

Fed. R. Civ. P. 54(d) permits the prevailing party to recover costs and attorney's fees. Under Kansas law, the prevailing party may recover attorney's fees if they are specifically

---

[10]*Bessman v. Bessman*, 520 P.2d 1210, 1218 (Kan. 1974).

[11]*Id.*

10

permitted by contract or statute.[12] K.S.A. § 60-3323 provides that if "willful and malicious misappropriation exists, the court may award reasonable attorney's fees to the prevailing party."[13] Here, the remaining issue is whether the attorney's fees are reasonable.

Once a party has established its entitlement to fees, the court must determine what fee is reasonable.  In determining reasonable attorney's fees, the court arrives at a lodestar figure by multiplying the hours counsel reasonably spent on the litigation by a reasonable hourly rate.[14] The applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates.[15]  Once an applicant has met this burden, the lodestar figure is presumed to be a reasonable fee.[16]

In order for the applicant to satisfy its burden of proving the number of hours reasonably spent on the litigation, the party must submit "meticulous, contemporaneous time records that reveal, for each lawyer for whom fees are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks."[17]  "The prevailing party must make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary."[18]  The Court "is justified in reducing the reasonable number of hours if the attorney's time records are 'sloppy and imprecise' and fail to document adequately how he or

---

[12]*Hartford Fire Ins. Co. v. P&H Cattle Co., Inc.*, 451 F. Supp. 2d 1262, 1248 (D. Kan. 2006).

[13]K.S.A. § 60-3323(iii).

[14]*Lippoldt v. Cole*, 468 F.3d 1204, 1222 (10th Cir. 2006) (citing *Blum v. Stenson*, 465 U.S. 886, 897 (1984); *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).

[15]*See Case v. Unified School Dist. No. 233*, 157 F.3d 1243, 1249–50 (10th Cir. 1998).

[16]*Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th Cir. 1998).

[17]*Case*, 157 F.3d at 1250 (citation omitted).

[18]*Robinson*, 160 F.3d at 1280.

she utilized large blocks of time."[19]

In this case, all attorneys and paralegals for UEI have filed affidavits evidencing their individual hours expended on the case.  Of the four attorneys and one paralegal that worked on the case, a total of 333 hours have been spent in the litigation of this matter.  The attorneys expended an additional 74.9 hours on the matter through the damages hearing.  The records submitted are specific to detailed individual tasks.  In this case, the Court is of the view that 407.9 hours are reasonable.  The attorneys, early on, prepared for a two day hearing, akin to a mini trial, on UEI's motion for preliminary injunction, which was granted.  The attorneys then continued to conduct depositions and file discovery motions.  Eventually a motion for summary judgment was filed by UEI and granted, culminating with the damages hearing.  Accordingly, the Court finds the hours expended are reasonable.

Calculating the lodestar also requires the court to examine the hourly rate requested by the plaintiff.  In examining the hourly rate, the court is to refer "to the prevailing market rates in the relevant community."[20]  The relevant community is the place where the litigation occurs.[21] "The first step in setting a rate of compensation for the hours reasonably expended is to determine what lawyers of comparable skill and experience practicing in the area in which the litigation occurs would charge for their time."[22]  In making this determination, if the court does not have before it adequate evidence of prevailing market rates, the court may, in its discretion,

---

[19]*Id.* (citing *Jane L. v. Bangerter*, 61 F.3d 1505, 1517 (10th Cir. 1995)).

[20]*Blum v. Stenson*, 465 U.S. 886, 895 (1984).

[21]*Jayhawk Investments, L.P. v. JetUSA Airlines, Inc.*, 1999 WL 974027, at *4 (D. Kan. 1999) (citation omitted).

[22]*Case*, 157 F.3d at 1256.

"use other relevant factors, including its own knowledge, to establish the rate."[23]

Four different attorneys worked on this action with differing amounts of experience.  The rates ranged from $165 per hour for an attorney with five years of experience to $270 per hour for an attorney with 20 years of experience, and $120 per hour for a paralegal with 8 years of experience.  After review, the Court finds that the going rates as requested by plaintiff's attorneys are reasonable.  Therefore, the lodestar amount of attorney's fees of $86,629.00 is a reasonable amount.

UEI also moves for costs and expenses associated with this litigation.  UEI has provided a detailed list of its cost, including invoices.  The total request of $4,003.95 is granted.  Finally, UEI seeks release of the bond placed in this Court for the issuance of the preliminary injunction.  The bond is therefore released.

**IT IS THEREFORE ORDERED BY THE COURT** that plaintiff is entitled to damages for misappropriation of trade secrets in the amount of $6,049,221.54; exemplary damages of $5,485,524.65; a permanent injunction in accordance with the Court's Summary Judgment Order (Doc. 66); damages for breach of loyalty of $26,441.59; reasonable attorney's fees of $86,629.00 and costs and expenses of $4,003.95; and release of the bond ordered in the Courts Preliminary Injunction Order (Doc.17).

**IT IS SO ORDERED**.

Dated:  <u>December 18, 2008</u>

<u> S/ Julie A. Robinson</u>
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[23]*Lippoldt v. Cole*, 468 F.3d 1204, 1225 (10th Cir. 2006) (citing *Case*, 157 F.3d at 1257).